UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE COMPLAINT OF          CIVIL ACTION
OCEAN RUNNER, INC., ETC., ET AL

                                                           NO. 04-530 & CONSOL. CASES

                                                           SECTION "C" (5)

OPINION

The issues pertaining to uninsured losses of the owners and operators of the LEE III, Ocean Runner, Inc. ("Ocean Runner")  were tried before the Court without a jury on August 21, 2006, and taken under advisement.   Participating at trial were Ocean Runner, the owners, charterers and managing owners of the ZIM MEXICO III, MS "Peter Rickmers" Schiffsbeteilingungsgesellschaft mbH & Co. KG, Petri Shipping Limited and Rickmers Reederei GmbH & Cie.KG, AS (collectively "Rickmers"), joined in by Gregory J. Blache, Jr. ("Blache").  Having considered the record, the evidence, the memoranda of counsel and the law, the Court has determined that the uninsured losses amount to $1,494,734.00.

1

The ZIM MEXICO III and the LEE III, owned and operated by Ocean Runner, Inc. ("Ocean Runner"), were involved in an accident in the Southwest Pass of the Mississippi River on February 21, 2004.  The LEE III sunk, was declared a constructive total loss and sold as scrap for $20,000.  Ocean Runner seeks two categories of uninsured losses: those allegedly pertaining to the value of the LEE III and certain miscellaneous out-of-pocket expenses.[1]   The Court previously held on summary judgment that Ocean Runner could not seek damages such as loss of business, loss profits or business interruption against Rickmers and was limited to the traditional damages based on the sound market value of the LEE III's at the time of the accident. (Rec. Doc. 220).   Ocean Runner maintains for purposes of trial that these prohibited items of loss are reflected in the value of the vessel at the time of the accident, under language contained in Complaint of Seabulk Offshore, Ltd., 212 F.Supp.2d 696, 697-698 (S.D.Tex. 2002),  to the following effect:

> Lost profits may not be awarded separately because they are accounted for in the damage formula in both the value of the vessel and the interest

---

[1] Ocean Runner and Rickmers have stipulated that $4,734.00 in expenses incurred in connection with the attendance and removal of the wreck and in connection with attendance in the Coast Guard hearings are recoverable expenses attributable to the collision.  In addition, these parties agree that Ocean Runner's $10,000.00 deductible is an uninsured recoverable expense attributable to the collision. (Rec. Doc. 336).  These appear to be the only sums at issue which do not depend on the value of the vessel.

> rate.  The value of the vessel includes the value of her future contribution to work.

(Rec. Doc. 313, pp. 9-10).  Based solely on this language in the Seabulk Offshore case, Ocean Runner continues to argue that an income approach/discounted cash flow method is the proper method to use in evaluating the LEE III.[2]  Although the Court rejected Ocean Runner's earlier permutation of its Seabulk Offshore argument on summary judgment, the Court agreed to accept evidence on the issue at trial.

Ocean Runner's argument is first undermined by the fact that the Seabulk Offshore case actually rejected the notion that a vessel can recover for loss of use when it is declared a constructive total loss.  Seabulk Offshore, 212 F.Supp2d 697.  Instead, that court rejected future profits as speculative and recognized and applied the measure of damages based on the value of the vessel and freight at the time of the loss.   Id.  Ocean Runner does not offer a single case in all of admiralty applying its argued method of valuation to a total loss under these circumstances.  For this and all of the other reasons set forth in the Court's April 10, 2006, Order and Reasons, the Court will abide by the traditional test which determines the loss by looking to the sound market

---

[2]     There is apparent among the experts and parties that there are three methods available for determining the "fair market value" of the LEE III: the asset value/cost approach, the income approach or the market approach/sales of comparables.

value of the vessel at the time of the accident, less salvage value received, plus interest and the net freight pending at the time of the loss.

In turn, the Court finds that in this matter, the appropriate method of evaluation the sound market value of the LEE III is the market approach. The Court also finds that the direct consideration of profits in evaluation is inappropriate where, as here, vessels are available in the market. "[I]n cases of total loss the probable profits of a charter not yet entered upon are always rejected." The UMBRIA, 266 U.S. 404, 421 (1897).

In any event, Ocean Runner's proof at trial failed to establish a value in excess of the insured value.[3] The LEE III was built in 1972. Ocean Runner purchased the vessel in 1997 for $540,000, with attendant closing costs totaling 44,503.58. (Exh. 11; Rec. Doc. 296, p. 26). Ocean Runner claims that it expended $2,156,413.29 in refurbishing the vessel for Coast Guard certification, which occurred in October 2000. (Exh. 25, Obj. Exh.

---

[3] At trial, the Court "conditionally admitted" the evidence pertaining to the income approach and the expert testimony of David Chaffe III ("Chaffe"), and investment banker engaged by Ocean Runner for expert valuation testimony. Some of the evidence is clearly not admissible for hearsay purposes, such as the vessel surveys from Robert L. Hale III (Obj. Exh. 7) and John L. Kingston & Associates (Obj. Exh. 8) as business records. (Obj. Exhs. 7 & 8). Even if all of the objected-to evidence proffered by Ocean Runner was considered (Exhs. 7, 8, 10, 11, 12 & 18), it does not provide credible proof by a preponderance of the evidence as to the propriety of deviating from the standard market value in this circumstance or that the vessel had a value in excess of $1,500,000.

10). It claims that the value of the LEE III should reflect those expenditures and/or be based on its daily rate of hire.

The only evidence supportive of the proposed valuation in excess of the insured amount comes from Ocean Runner's President, Joseph Grasso, III ("Grasso). Although Grasso has extensive maritime experience, he was not proffered as an expert and agreed that he was not an expert on valuation of vessels. His testimony appeared somewhat biased and his memory selective. Grasso's testimony as to the value of the LEE III focused on various improvements allegedly made to the LEE III after its purchase, which he claims enhanced its value beyond that enjoyed by vessels with identical capabilities.[4] He also claimed to have saved money by doing these repairs at the Ocean Runner shipyard, and testified that upon completion of the repairs, the vessel was the same as if it was new.

Grasso's credibility problems begin with the discrepancy in vessel value between his testimony at trial, between $2,500,000 - $2,750,000, and at his deposition, "around" $2,000,000. He also admitted in trial testimony that the vessel was insured for

---

[4] Grasso did not testify that each improvement was needed for Coast Guard certification. He also did not testify as to amounts expended for maintenance on the vessel. The Court does not need to find that the amounts claimed to have been spent on improvements to the LEE III were actually spent, however, and will assume that these amounts were so expended for purposes of this Opinion.

$2,000,000 at the time of the accident, and that a corresponding March 2003 survey set the fair market value of the vessel at $2,000,000. Grasso testified at trial that he diminished the survey value of his vessels for insurance purposes to save money on premiums because he had never had a total loss. He conveniently could not recall the amount of his debt/fleet mortgage at time of casualty. Grasso testified that he was "blackballed" by the industry after the accident.

Grasso also admitted that all of Ocean Runner's vessels were for sale prior to the accident. At trial, Grasso agreed that Ocean Runner's BEAU G was Ocean Runner's vessel most similar to the LEE III. The BEAU G's day rate of $3,500 was most similar to LEE III, which commanded a $3,400-$3,600 day rate. The evidence indicated that the BEAU G had an asking sale price of $2,300,000 in May 2004, although its opening bid at auction was $600,000 and it sold for $900,000 in May 2004. (Exh. 30, Obj. Exh. 20). Grasso also testified that he spent $750,000 refurbishing the BEAU G in 1995, but the work was done at a shipyard and was less extensive as the work performed on the LEE III.

Ocean Runner called Jules Schubert ("Schubert"), the marine surveyor for hull underwriters, who had valued the vessel at $1,500,000 when underwriters paid the full $2,000,000 policy limits and declared the vessel a constructive total loss. Schubert's

valuation took into account the fact that the LEE III was in good shape. He also testified that the amount claimed by Ocean Runner to have been expended on the vessel was excessive when done, that similar older vessels were available for between $450,000 and $500,000 and that it should cost between $600,000 to $1,000,000 to bring older vessels into Coast Guard compliance. Although Schubert testified that the vessel was not worth the alleged $2,7000,000 spent for acquiring and refurbishing in the late 1990's, and although the amount was excessive when performed, the refurbishment may have added as many as 20 years to the vessel's work life. Schubert's cost approach analysis yielded a value of $2,200,000. When asked by Ocean Runner about a "rule of thumb," method of evaluation, Schubert testified that the rule does not apply to a vessel that does not have a utilization rate of at least 80-90%.[5]

Ocean Runner also offered the testimony of Chaffe, an investment banker with experience in evaluating offshore vessel companies, who used the income approach for

---

[5] The "rule of thumb" method is based on the day rate charged by a vessel under normal market parameters and would yield a value of $3,500,000 for the LEE III. Court finds that the argument for the application of this "rule of thumb" is not persuasive, especially in light of the testimony that the LEE III had no future jobs under contract at the time of the accident. In any event, the rule would appear to be inapplicable here based on Schubert's testimony that it requires a utilization rate in excess of 80%, and the highest utilization rate submitted by Ocean Runner is 67.14%. (Obj. Exh. 18).

the LEE III to reach a value of $5,400,000 as of the date of the accident, which represented a "soft" period in the market. He admitted that he was a generalist appraiser, not a maritime appraiser, and could not show that any similar vessel had sold for even $2,000,000. Chaffe testified that market sales are probably the best indicator of value if there are sales of comparable vessels completed at about the same time.

      Richmers's marine surveyor, Peter Kolp ("Kolp"), testified that the best indicator of a vessel's value is comparable sales and using a number of comparable sales, opined a fair market value of $693,000 at the time of the accident in February 2004. He testified that another maritime company had 80 supply vessels available for purchase in 2004, and that no buyer would pay more than $1,000,000 for the LEE III at that time. He alternatively used a income approach used on assumptions of a lower day rate and a utilization rate to reach a $906,000 value. Kolp testified that the income approach was very speculative, and that it was a volatile market at the time with a downward trend since 1997 to the date of the accident. He used a combination of the market and income figures to render an opinion of a $746,000 value as of February 2004. Kolp testified that the vessel's good condition was assumed in the opinion and would extend the work life of the vessel 5 - 10 years. He testified that older vessels require substantial sums in

maintenance to stay in business, and that investing over $2,000,000 into an older vessel like the LEE III does not produce the equivalent of a new vessel. Kolp stated that the cost approach could not be utilized because no one was building vessels like the LEE III in 2004. He did not dispute that the cost of replacing the LEE III would be $7,000,000.

The preponderance of the evidence supports the finding that the sound market value of the LEE III and its pending freight and fuel did not exceed $1,500,000 at the time of the accident. This finding is supported, in large part, by Schubert's opinion, which is the most objective of those opinions offered. No greater value is supported by credible evidence. Any greater value provided by the income approach, assuming that approach was appropriate, is inherently speculative given the lack of a future contract for the vessel and the overabundance of similar supply vessels available for sale and hire at the time of the accident. The cost approach yields an absurd result for this old refurbished vessel and is inappropriate in light of the testimony that supply vessels less than 200 feet in length were no longer being fabricated.

Accordingly,

IT IS ORDERED that the sound market value of the LEE III and its pending freight and fuel is $1,500,000, less $20,000 salvage, and the value of the uninsured loss in this matter is $10,734.00, per the stipulation of the parties. The Court finds that there is

no just reason for delay and directs the entry of judgment in accordance with this opinion under Fed. R. Civ. P. 54(b). The parties shall submit a proposed judgment, approved as to form, within five days from the date of this Opinion.

New Orleans, Louisiana, this 5th day of October, 2006.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE